**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| POM OF PENNSYLVANIA, LLC,<br>PLAINTIFF,<br><br>v.<br><br>RYAN KELLEY,<br>DEFENDANT. | :<br>:<br>:<br>:<br>:<br>:<br>: | <br><br>Case No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff POM of Pennsylvania, LLC ("POM") states the following:

## PARTIES

1. POM is a limited liability company organized under the laws of the State of Wyoming.

2. The activities and business of POM are directed from the company's headquarters in Duluth, Georgia, which is where the company's officers and many of its employees are based.

3. POM's sole member is another limited liability company, the ultimate owner of which is a natural person who resides and is domiciled in a State that is not Pennsylvania. That individual has resided in that State for many years and intends to maintain his residence within that State indefinitely. No citizen, domiciliary, or resident of Pennsylvania holds any ownership interest in POM or any limited liability company within the ownership chain of POM.

4. Defendant Ryan Kelley ("Kelley") is a citizen of the Commonwealth of Pennsylvania. He has resided and made his home within Pennsylvania for several decades, and he worked within Pennsylvania for several decades. On information and belief, Kelley intends to remain in Pennsylvania indefinitely.

## JURISDICTION

5. This Court has subject-matter jurisdiction over Counts I to IV and VII of the Complaint pursuant to 28 U.S.C. § 1332, because POM and Kelley are citizens of different States, and the amount in controversy exceeds $75,000.00.

6. This Court has subject-matter jurisdiction over Counts V and VI of the Complaint pursuant to 28 U.S.C. § 1331, because those Counts arise under the laws of the United States.

7. This Court also has subject-matter jurisdiction over Count VI of the Complaint pursuant to 18 U.S.C. § 1836(c).

8. This Court also has subject-matter jurisdiction over Counts I to IV and VII of the Complaint pursuant to 28 U.S.C. § 1367, because all Counts of the Complaint arise out of a common nucleus of operative fact.

9. The Court has personal jurisdiction over Kelley with respect to the claims asserted in this action. As described below, Kelley has contractually agreed to jurisdiction in this Court with respect to the claims asserted in this action, and he has contractually waived any objection to personal jurisdiction. In addition, as

described below, Kelley engaged in conduct within the State of Georgia and this District that gives rise, in part, to the claims asserted in this action. In addition, as described below, Kelley engaged in conduct that was directed at the State of Georgia and this District that gives rise, in part, to the claims asserted in this action.

10. Venue is proper in this Court. As described below, Kelley has contractually agreed to venue in this Court with respect to the claims asserted in this action, and he has contractually waived any objection to venue. In addition, as described below, a substantial part of the events giving rise to POM's claims in this action occurred within this District, in particular, Gwinnett County, Georgia. In addition, as described below, a substantial part of the intellectual property and confidential information that is the subject of this action was situated within this District, in particular, Gwinnett County, Georgia.

## ALLEGATIONS COMMON TO ALL COUNTS

### I. POM's Electronic Skill Gaming Business and the Critical Role of POM's Compliance Department

11. POM and its affiliates design and license electronic skill gaming software and related intellectual property for use in several States.

12. At all times relevant to this Complaint, POM licensed electronic skill gaming software and related intellectual property for use in the Commonwealth of Pennsylvania.

13. Before POM and its affiliates introduce their electronic skill games into a new jurisdiction, they first seek a clear determination from regulators or a court that the games comply with applicable law and do not constitute gambling.

14. POM prioritizes compliance with state law and does not operate in jurisdictions without first obtaining clear guidance from courts or regulators that its games are legal within those jurisdictions.

15. In Pennsylvania, POM did not enter the market until it received a ruling from a state trial court holding that POM's games did not constitute gambling under Pennsylvania law. That judgment was not appealed.

16. At all times relevant to this Complaint, Pennsylvania courts had repeatedly held that POM's games did not constitute gambling under Pennsylvania law.

17. In reliance on those court rulings, at all times relevant to this Complaint, POM distributed its electronic skill games within Pennsylvania.

18. POM games were hosted at establishments such as fraternal lodges and restaurants.

19. Establishments hosting POM games receive a substantial portion of the revenue from those games, and this revenue often accounts for a significant portion of the income for those establishments.

20. Establishments that host POM games must enter into a contractual relationship with POM and/or its affiliates. Among other things, those contracts impose a number of obligations to ensure that the games are used in a responsible, safe, and fair manner.

21. For example, establishments must ensure that individuals under the age of 21 do not play POM games.

22. Establishments must also ensure that players receive all winnings that they have earned from the POM games. Because the outcome of POM's games depends predominantly on skill rather than chance, certain particularly skilled players earn significant winnings from POM games.

23. Establishments that host POM games also contractually agree that they will not host electronic games that constitute unlawful gambling under state law.

24. At all times relevant to this Complaint, in Pennsylvania and elsewhere, POM has faced substantial competition from illegal electronic games that constitute gambling under state law.

25. Consistent with the company's prioritization of legal compliance, POM and its affiliates operate a robust Compliance Department.

26. The Compliance Department helps ensure that POM complies with all laws applicable to POM and its games.

27. As part of that function, the Compliance Department works closely with POM's in-house counsel and outside counsel on a variety of legal matters, including evaluation of the legality of POM games and business practices; litigation involving the legality of POM games; and other legal matters.

28. As a result, Compliance Department personnel regularly attend and participate in discussions with POM's counsel that are covered by the attorney-client privilege and/or the work-product doctrine. Similarly, Compliance Department personnel regularly are included on email and other correspondence with POM's counsel covered by the attorney-client privilege and/or the work-product doctrine.

29. The Compliance Department also ensures that establishments hosting POM games comply with their contractual obligations, including those contractual provisions intended to ensure that POM games are used in a responsible, safe, and fair manner.

30. Among other things, the Compliance Department ensures that establishments hosting POM games do not also host illegal electronic games that constitute gambling under applicable state law.

31. As part of that function, the Compliance Department regularly inspects establishments that host POM games to ensure that no illegal games are present.

32. To enable these compliance activities, the Compliance Department receives access to comprehensive and detailed data regarding the locations of POM machines (the "Machine Location Datasets").

33. Compliance Department personnel frequently develop close relationships with the owners and operators of establishments that host POM games.

34. The Compliance Department also ensures that locations hosting POM games pay all winnings earned by players and that locations do not prevent particularly skillful players from playing POM games.

35. To enable these compliance activities, the Compliance Department often receives access to comprehensive, detailed, machine-level data regarding the profitability of particular POM machines.

36. Because the Compliance Department frequently conducts investigative activities and frequently interfaces with law enforcement, POM frequently hires retired law-enforcement officers to work within its Compliance Department.

## II. Kelley's Hiring as a Compliance Officer and the Contractual Obligations That He Assumed

37. For many years, Kelley worked as a trooper in the Pennsylvania State Police ("PSP").

38. In or about September 2019, Kelley contacted POM about the possibility of working within POM's Compliance Department.

39. Kelley represented to POM that he planned to retire from the PSP and was seeking post-retirement employment.

40. Kelley had a pre-existing relationship with POM's then-national compliance director, Rick Goodling, from their time working together in the PSP. Like Kelley, Goodling had worked in the PSP for many years prior to joining POM.

41. POM offered Kelley a position as a compliance officer for POM.

42. Kelley accepted that position.

43. On or about September 24, 2019, Kelley and POM entered into a Confidentiality, Nonsolicitation and Assignment Agreement ("Employment Agreement").

44. Pursuant to the Employment Agreement, POM agreed to pay Kelley salary and other compensation for his work as a compliance officer.

45. Kelley also made a number of commitments pursuant to the Employment Agreement.

46. Section 3 of the Employment Agreement ("Section 3") is titled "Nondisclosure, Nonsolicitation and Noncompetition Covenants." Section 3 has three subsections.

47. Subsection (a), titled "Nondisclosure Covenant," imposes restrictions on Kelley's ability to disclose and use POM's confidential information, both during and after Kelley's employment.

48. Among other things, Subsection (a) provides that "[Kelley] agrees that . . . (i) [Kelley] shall keep and maintain the Confidential Information in strictest confidence, (ii) [Kelley] shall not, either directly or indirectly, use any Confidential Information for his own benefit, and (iii) [Kelley] shall not, either directly or indirectly, divulge, disclose or communicate any Confidential Information in any manner whatsoever to any person or entity other than to employees or agents of the Company having a need to know such Confidential Information to perform their responsibilities on behalf of the Company."

49. The Employment Agreement defines "Confidential Information" to include "any and all information related to the business of [POM] and/or its subsidiaries which is not generally known to the public, including (but without limitation) (i) trade secrets, processes, data, files, computer programs, improvements, inventions, research and development, techniques, marketing plans, pricing structures, strategies (including legal strategies), forecasts, copyrightable material, suppliers, methods and manner of operations; (ii) information relating to the identity, needs and location of all present and prospective customers; (iii) information with respect to the internal affairs of the Company and its subsidiaries; and (iv) information of others that has been provided to [POM]."

50. Subsection (b), titled "Nonsolicitation Covenants," imposes restrictions on Kelley's ability to "contact, solicit or call upon the customers of [POM] with

whom [Kelley] has had any material contact during the last year of [Kelley's] employment with [POM] if the purpose of such activity is either (1) to solicit these customers for a Competitive Business as defined herein below (including but not limited to any Competitive Business started by [Kelley]) or (2) to otherwise encourage any such customer to discontinue, reduce, or adversely alter the amount of its business with [POM]," during his employment and for a period of two years after the termination of his employment.

51. Subsection (b) defines "Competitive Business" as "an enterprise that is in the business of offering products in the Business . . ., which products are similar or identical to (or have similar or identical uses as) those offered by [POM] during [Kelley's] employment with [POM]."

52. The Employment Agreement defines "Business" as "the business of designing, manufacturing, selling or distributing software, circuit boards or game terminals for the gaming industry."

53. Subsection (c), titled "Non-competition," provides that "during [Kelley's] period of employment with [POM] . . . and for a period of two (2) years after the date of termination of [Kelley's] employment with [POM] . . ., [Kelley] shall not, without the prior written permission of [POM], either individually or in association with any other person or entity, as an owner, investor, director, officer, agent, advisor, employee, consultant or otherwise, directly or indirectly engage in

the business of the manufacture, sell [sic] or servicing of amusement games, whether they be games of skill, no-chance or otherwise, sweepstakes and/or raffle games."

54. Subsection 5(a) of the Employment Agreement provides that the "Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to conflicts of law principles thereof."

55. Subsection 5(h) of the Employment Agreement provides that, in the event of "any dispute or controversy arising under or in connection with Section 3 . . . (i) [POM] shall have the right to seek equitable remedies and all other legal relief in any court of competent jurisdiction, (ii) the parties expressly agree to jurisdiction and venue in the appropriate state or federal court for Gwinnett County, Georgia, and (iii) waive any defenses to this forum and venue selection."

## III. Kelley's Work as a Compliance Officer for POM

56. Kelley worked as a compliance officer for POM from September 27, 2019 until December 31, 2022.

57. During that time period, POM paid approximately $300,000 in salary, bonuses, employee benefits, and other amounts relating to Kelley's employment.

58. Kelley played an active role in all aspects of the POM Compliance Department's activities in Pennsylvania.

59. Among other things, Kelley was intimately involved in POM's legal and litigation decision making process, particularly with respect to challenges to the legality of POM's games in Pennsylvania.

60. Kelley attended and participated in numerous telephone, in-person, and written communications with POM's in-house counsel and outside litigation counsel regarding strategy for actual and potential litigation, including actual and potential litigation against the PSP and the Commonwealth of Pennsylvania.

61. These privileged meetings with counsel in which Kelley participated included meetings that Kelley attended in-person at POM's Duluth, Georgia, headquarters.

62. Many of the privileged telephone calls that Kelley attended included POM's General Counsel and other in-house lawyers. For example, Kelley participated in a weekly, privileged call with POM's General Counsel.

63. At the time of his participation in these privileged phone calls, Kelley was aware that POM's General Counsel and other in-house counsel worked principally from Duluth, Georgia.

64. Many of the privileged written communications (including emails) to which Kelley was a party were sent to, or received from, POM's General Counsel or other in-house counsel.

65. At the time of his receipt of these privileged written communications, Kelley was aware that POM's General Counsel and other in-house counsel worked principally from Duluth, Georgia.

66. Through his participation in the communications described above, Kelley obtained extensive information protected by the attorney-client privilege and the work-product doctrine. That privileged information included information relating to actual and potential litigation directly adverse to the PSP and the Commonwealth of Pennsylvania.

67. In his role as a compliance officer, Kelley played an active role in ensuring that establishments hosting POM games complied with their contractual obligations.

68. Among other things, Kelley was responsible for ensuring that establishments hosting POM games did not also host illegal gambling machines.

69. Kelley was also responsible for compiling and updating data regarding the establishments hosting POM games in Pennsylvania.

70. To enable Kelley to perform these tasks, Kelley received access to confidential information regarding the locations of POM's machines, including but not limited to the Machine Location Datasets and data contained within the Machine Location Datasets.

71. This confidential information was hosted on POM's servers, which were located in or about Duluth, Georgia. Kelley could only access such information by accessing POM's servers.

72. Kelley was aware that POM's servers were located in or about Duluth, Georgia.

73. In his role as a compliance officer, Kelley played an active role in ensuring that locations hosting POM games pay all winnings earned by players and that locations do not prevent particularly skillful players from playing POM games.

74. To enable Kelley to perform this task, Kelley received access to confidential information regarding the profitability of POM machines.

75. This confidential information was hosted on POM's servers, which were located in or about Duluth, Georgia. Kelley could only access such information by accessing POM's servers.

76. In his role as a compliance officer, Kelley played an active role in evaluating potential new locations for hosting POM games.

77. To enable Kelley to perform this task, Kelley received access to confidential information regarding prospective locations for placing POM games in the future.

78. This confidential information was hosted on POM's servers, which were located in or about Duluth, Georgia. Kelley could only access such information by accessing POM's servers.

79. POM invested substantial resources in compiling and generating this information, which rested on analyses of a range of factors including location, traffic, and other factors.

80. In the course of his work as a compliance officer for POM, Kelley developed relationships with the owners and operators of establishments hosting POM games. Kelley would not have had the opportunity to develop those professional relationships but for his role as a POM compliance officer.

## IV. Kelley's Surreptitious Role in Illegal Gambling Enterprises That Directly Harmed POM

81. During his POM employment, POM had the impression that Kelley was an honest and loyal employee.

82. Unbeknownst to POM, however, during his POM employment, Kelley was directly aiding third parties to harm and compete with POM.

83. Working together with Goodling, Kelley assisted two business enterprises—the Deibler enterprise and the Conley enterprise—in competing against POM and operating illegal gambling machines in locations within Pennsylvania.

84. Kelley used POM confidential information to help the Deibler and Conley enterprises identify locations for placing their illegal gambling machines, and he disclosed POM confidential information to those enterprises for that purpose.

85. That POM confidential information included the Machine Location Datasets (or data contained therein).

86. Kelley served as an intermediary between the Deibler and Conley enterprises and establishments where the enterprises' illegal gambling machines would be placed, including establishments with which Kelley had become familiar during the course of his employment for POM.

87. Kelley caused, either directly or indirectly, illegal gambling machines to be placed at establishments that also hosted POM machines—despite the fact that a core component of his compliance officer role was ensuring that illegal gambling machines were *not* located in the same establishments as POM machines.

88. Those illegal gambling machines directly competed with POM machines.

89. As a result of competition from those illegal gambling machines, POM lost substantial revenue.

90. Kelley also quashed complaints that were submitted regarding the placement of illegal gambling machines at establishments that hosted POM games—

despite the fact that investigating and taking action on such complaints was a core component of Kelley's POM employment.

91. Kelley and Goodling both received substantial payments from the Deibler and Conley enterprises for their work adverse to POM, generally in the form of large cash payments on a weekly or monthly basis.

92. As described below, POM did not learn of Kelley's involvement with the Deibler and Conley enterprises until after October 29, 2024, nor did POM have any reason to suspect such involvement until after that date.

## V. Kelley's Unauthorized Disclosure of POM's Attorney-Client Privileged and Confidential Information to Government Actors

93. Although POM was not aware of it at the time, during his POM employment, Kelley disclosed POM's privileged and confidential information to government actors.

94. Based on information provided by Kelley to POM in late 2025 and early 2026, Kelley disclosed extensive amounts of privileged and work-product-protected information to the PSP and/or the Federal Bureau of Investigation ("FBI").

95. In particular, Kelley disclosed to the PSP and/or the FBI the contents of substantially all privileged and work-product-protected communications to which Kelley was a party during his POM employment.

96. Among other things, Kelley disclosed to the PSP and/or the FBI the contents of privileged and work-product-protected communications with POM's

outside litigation counsel regarding strategy for actual and potential litigation against the PSP and the Commonwealth of Pennsylvania.

97. As described above, the privileged communications that Kelley disclosed to the PSP and/or the FBI included the contents of in-person meetings that occurred in Duluth, Georgia, as well as the contents of telephone calls and email communications including participants that Kelley knew to be working from Georgia.

98. Based on information received by POM, no steps were taken by law enforcement to isolate or contain this privileged and protected information, such as by the use of a "taint team" or a firewall to prevent investigators or prosecutors from using the information.

99. Kelley also disclosed to the PSP and/or the FBI other confidential information regarding POM's business operations and strategy, finances, personnel, and other matters.

100. POM did not authorize Kelley to disclose any of its privileged, work-product-protected, or otherwise confidential information to the PSP and/or the FBI.

101. No court order, subpoena, or other legal process required or authorized Kelley to disclose POM's privileged, work-product-protected, or otherwise confidential information to the PSP or the FBI.

102. As described below, POM did not learn of Kelley's unauthorized disclosures of confidential information to the PSP and the FBI until after October 29, 2024, nor did POM have any reason to suspect that such disclosures may have occurred until after that date.

**VI. Kelley's Unauthorized Post-Employment Intrusions into POM's Email System**

103. In late 2022, Kelley voluntarily resigned from his employment with POM.

104. Kelley's employment with POM terminated effective December 31, 2022.

105. Kelley did not perform any work on behalf of POM after December 31, 2022.

106. Kelley was aware that, upon the termination of his employment, he was not authorized to access any of POM's computer or communication systems.

107. Kelley was aware that POM's Employee Handbook provided that:

> This policy specifically requires employees to return all Company property (including electronically stored information) that employees may have taken outside of the office (e.g., personal residence) or transferred to or stored on non-Company computers and other electronic storage devices (including PDAs) during the course of their

> employment. Employees should clearly understand that, ***upon termination of their employment, they are without authorization to access or use any such Company property, whether through a Company-sponsored computer or computer network or via a non-Company computer or other electronic storage device. Further, for the avoidance of doubt, this policy also makes clear that no employee is authorized to access the Company's computer/network system after termination of employment, unless such post-termination access is expressly authorized in writing by the President of the Company.***

(emphasis added).

108. Kelley was also aware that POM's Employee Handbook provided that, "[u]pon termination of employment, employees must return all passwords to the Company."

109. Kelley was also aware that POM's Employee Handbook provided that "[a]ll of the Company's technology resources, including all data and files stored on or transmitted using the Company's technology resources, are property of the Company. This means that the Company owns all data and files stored on or

transmitted using any of the Company's technology resources, such as computers, network servers, or email servers."

110. Despite the termination of his authorization to access POM's email systems as of the end of 2022, Kelley repeatedly accessed and used POM's email systems during 2023.

111. On or about April 18, 2023, Kelley accessed POM's email system and moved an email with the subject line "Pennsylvania Operator Meeting Agenda" to the email account's "archive." That email had not been opened prior to Kelley's unauthorized accessing of POM's email system.

112. On or about September 7, 2023, Kelley accessed POM's email system and forwarded an email with the subject line "Skill Games in the News" to Kelley's personal email address. That email had not been opened prior to Kelley's unauthorized accessing of POM's email system.

113. On or about October 4, 2023, Kelley accessed POM's email system and forwarded an email with the subject line "Seize machines" to Kelley's personal email address.

114. On or about October 25, 2023, Kelley accessed POM's email system and forwarded an email with the subject line "Letter from Lou" to an email address whose ownership and control is unknown. That email had not been opened prior to Kelley's unauthorized accessing of POM's email system.

115. Each of the emails described above contained confidential and sensitive information about POM's business operations that was not disclosed to the public at large.

116. On each of the occasions described above, by accessing POM's email system, Kelley gained access to all emails stored within his former email account, not merely the specific emails that he forwarded or archived. The emails stored in that email account included emails that had not been opened prior to Kelley's unauthorized accessing of POM's email system.

117. Kelley did not have authorization to access any of the emails described above and did not have authorization to access any POM email or computer systems after December 31, 2022.

118. No court order, subpoena, or legal process authorized Kelley to access any of the emails described above or any of POM's email or computer systems.

119. At all relevant times, POM operated its email through the Microsoft 365 cloud-based email service.

120. At all relevant times, POM saved or backed up the contents of its email system on servers located in or about Duluth, Georgia.

121. In order to access POM's email system, Kelley would first have had to navigate to a specific log-in page. He would then have had to enter both a username and password. It is not possible to complete this multi-step process inadvertently.

122. In order to forward an email within POM's email system, Kelley first would have had to scroll through the inbox to select a particular message. He would then have had to click on that message, click on the "forward" button, enter the email address to which the message would be forwarded, and click the "send" button. It is not possible to complete this multi-step process inadvertently.

123. In order to "archive" an email within POM's email system, Kelley first would have had to scroll through the inbox to select a particular message. He would then have to click on that message and click the "archive" button. It is not possible to complete this multi-step process inadvertently.

**VII. POM's Discovery of Kelley's Unlawful Conduct**

124. Prior to October 29, 2024, POM was unaware of—and had no reason to suspect—Kelley's misconduct described above.

125. Prior to October 2024, POM was under the impression that Kelley had been an honest and loyal employee who had complied with his contractual obligations and acted in POM's best interests.

126. Kelley took steps to conceal the misconduct described in this Complaint.

127. In October 2024, a Pennsylvania investigating grand jury returned presentments—*i.e.*, recommendations to initiate criminal charges—in two matters (the "Presentments").

128. Presentment No. 11 recommended charges against members of the Deibler enterprise.

129. Presentment No. 15 recommended charges against Goodling.

130. POM did not learn of or receive copies of the Presentments until October 29, 2024.

131. Prior to that date, the Presentments were maintained under seal, and there was no public access to the Presentments or the information contained in them.

132. Both Presentments described the investigation that led to the charging recommendations.

133. Although the Presentments do not identify Kelley by name, they provide certain facts that—once known to POM—raised suspicion that Kelley had been collaborating with one or more criminal enterprises during his POM employment, to POM's detriment, and that Kelley had been providing information to law enforcement during his POM employment.

134. When POM learned of the Presentments, it immediately commenced an investigation of Kelley's conduct, whether that conduct had adversely affected POM or its business, and whether Kelley had disclosed any POM confidential information.

135. POM incurred substantial expenses in conducting that investigation.

136. In late 2025 and early 2026, representatives of POM spoke with Kelley regarding the subject matter of this Complaint. During those discussions, Kelley provided substantial information relating to the conduct alleged in this Complaint.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT – VIOLATIONS OF § 3 OF EMPLOYMENT AGREEMENT BY PARTICIPATING IN CRIMINAL ENTERPRISES

137. POM incorporates by reference herein Paragraphs 1-136 of this Complaint.

138. As described above, POM and Kelley entered into a written contract, that is, the Employment Agreement.

139. At all relevant times, Kelley was able to contract.

140. Kelley assented to the terms of the Employment Agreement, as reflected by his execution of the Employment Agreement.

141. Kelley received consideration pursuant to the Employment Agreement, including employment with POM from September 2019 until December 2022; hundreds of thousands of dollars in salary and bonuses; and employee benefits, including health insurance coverage, financed by POM.

142. POM fully performed all of its obligations under the Employment Agreement.

143. Kelley breached Subsection 3(a) of the Employment Agreement by disclosing POM's Confidential Information to the Deibler and Conley enterprises, including:

a. Disclosing POM's Confidential Information regarding actual or prospective locations of POM games to the Deibler and Conley enterprises, in order for those enterprises to use that Confidential Information for the enterprises' own purposes and to the detriment of POM;

b. Disclosing POM's Confidential Information regarding the profitability of POM games to the Deibler and Conley enterprises, in order for those enterprises to use that Confidential Information for the enterprises' own purposes and to the detriment of POM; and

c. Disclosing the Machine Location Datasets (or the contents thereof) to the Deibler and Conley enterprises, in order for those enterprises to use that Confidential Information for the enterprises' own purposes and to the detriment of POM.

144. The foregoing information related to POM's business and was not generally known to the public.

145. Kelley made the foregoing disclosures during the term of his POM employment, as well as after the conclusion of his POM employment while the information remained confidential.

146. Kelley breached Subsection 3(b) of the Employment Agreement by contacting, soliciting, and calling upon establishments—with whom Kelley had material contact during the last year of his POM employment—for the purpose of soliciting those establishments to host illegal gambling machines that would compete with POM's games.

147. Those illegal gambling machines, and the Deibler and Conley enterprises that owned and/or operated them, constituted a Competitive Business under the Employment Agreement.

148. Establishments that hosted POM games constituted customers of POM within the meaning of Subsection 3(b).

149. Kelley engaged in his breaches of Subsection 3(b) both during the term of his POM employment and during the two years following the termination of his POM employment.

150. Kelley breached Subsection 3(c) of the Employment Agreement by working—both during the term of his POM employment and during the two years following the termination of his POM employment—as an owner, investor, director, officer, agent, advisor, employee, or consultant of one or more enterprises that were

directly or indirectly engaged in the business of the manufacture, sale, or servicing of amusement games.

151. As a direct and proximate result of Kelley's breaches of Section 3 of the Employment Agreement, POM sustained actual damages, including lost revenue as a result of the diversion of business opportunities, unfair competition from illegal gambling machines, diminution in value of POM's Confidential Information, and the deprivation of the economic value of Kelley's honest services.

## COUNT II
## BREACH OF CONTRACT – VIOLATION OF § 3 OF EMPLOYMENT AGREEMENT BY DISCLOSING PRIVILEGED AND CONFIDENTIAL INFORMATION TO GOVERNMENT ACTORS

152. POM incorporates by reference herein Paragraphs 1-136 and 138-142 of this Complaint.

153. Kelley breached Subsection 3(a) of the Employment Agreement by disclosing POM's Confidential Information to the FBI and/or the PSP, including:

a. Disclosing the contents of POM's attorney-client privileged and work-product-protected communications, including communications regarding POM's strategy for actual and contemplated litigation, to the FBI and the PSP; and

b. Disclosing Confidential Information regarding POM's business strategy and operations to the FBI and the PSP.

154. The foregoing information related to POM's business and was not generally known to the public.

155. Kelley made the foregoing disclosures during the term of his POM employment, as well as after the conclusion of his POM employment while the information remained confidential.

156. As a direct and proximate result of Kelley's breaches of Section 3 of the Employment Agreement, POM sustained actual damages, including but not limited to deprivation of the economic value of Kelley's honest services.

**COUNT III**
**BREACH OF CONTRACT – VIOLATION OF § 3 OF EMPLOYMENT AGREEMENT THROUGH UNAUTHORIZED POST-EMPLOYMENT ACCESS AND USE OF POM EMAIL SYSTEM**

157. POM incorporates by reference herein Paragraphs 1-136 and 138-142 of this Complaint.

158. Kelley breached Subsection 3(a) of the Employment Agreement by using Confidential Information—namely, confidential email login information and credentials—to access POM's email system during 2023, after the conclusion of Kelley's POM employment.

159. That information related to POM's business and was not generally known to the public.

160. Kelley thereby used POM's Confidential Information for his own benefit, and not for legitimate purposes associated with POM's business, in violation of Section 3.

161. Kelley further breached Subsection 3(a) of the Employment Agreement by transmitting at least three emails that were stored on POM's email system to accounts hosted on other email systems.

162. The contents of those emails constituted information related to POM's business and were not generally known to the public.

163. By transmitting those emails from POM's secure email system to other email systems over which POM had no control—including to one email address whose ownership and control remains unknown to POM—Kelley failed to keep and maintain the contents of the emails in strictest confidence, in violation of Section 3.

164. On information and belief, Kelley used the contents of the emails for his own benefit, and not for legitimate purposes associated with POM's business, in violation of Section 3.

165. On information and belief, Kelley disclosed the contents of the emails to Goodling, the Deibler enterprise, and/or the Conley enterprise, in violation of Section 3.

166. As a direct and proximate result of Kelley's breaches of Section 3 of the Employment Agreement, POM sustained actual damages, including but not

limited to diminution in value of POM's Confidential Information and costs incurred in connection with investigating and remedying Kelley's intrusions into POM's email system.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**

167. POM incorporates by reference herein Paragraphs 1-136 of this Complaint.

168. Due to his role as a compliance officer, Kelley occupied a position of trust and confidence that afforded him access to some of the company's most sensitive and confidential information.

169. POM granted to Kelley considerable authority and discretion so that Kelley could protect the company's interests.

170. Kelley owed fiduciary duties, including duties of loyalty and care, to POM.

171. Kelley breached the fiduciary duties that he owed to POM, including through the following conduct:

a. Disclosing POM's confidential information and trade secrets to third parties, without POM's authorization and for reasons that directly conflicted with POM's best interests;

b. Surreptitiously assisting enterprises, including the Deibler and Conley enterprises, that competed directly against POM;

c. Soliciting POM's customers and business contacts to partner with enterprises, including the Deibler and Conley enterprises, that competed directly against POM; and

d. Causing establishments hosting POM games to breach their contractual obligations to POM, to POM's affiliates, and/or pursuant to contracts of which POM or its affiliates were third-party beneficiaries.

172. Kelley engaged in the foregoing conduct during his POM employment.

173. As a direct and proximate result of the foregoing misconduct, POM sustained actual damages, including lost profits and the deprivation of Kelley's honest services.

174. Kelley's misconduct described in this Count arises out of and is connected to violations of Section 3 of the Employment Agreement. Among other things, the misconduct giving rise to this Count violates Section 3 of the Employment Agreement.

## COUNT V
## VIOLATION OF FEDERAL STORED COMMUNICATIONS ACT

175. POM incorporates by reference herein Paragraphs 1-136 and 157-166 of this Complaint.

176. As described above, Kelley repeatedly accessed POM's cloud-based email system during 2023, after the termination of his POM employment.

177. On each of those occasions, Kelley intentionally accessed POM's cloud-based email system.

178. On each of those occasions, Kelley lacked authorization to access POM's cloud-based email system, and Kelley knew that he lacked such authorization.

179. As described above, by accessing POM's cloud-based email system on the occasions described above, Kelley gained access to electronic communications within that email system.

180. The electronic communications to which Kelley gained access were in electronic storage at the time that Kelley accessed the cloud-based email system.

181. POM operates its cloud-based email system through the Microsoft 365 cloud-based email service, which constitutes a facility through which an electronic communication service is provided.

182. POM's email system provides to users thereof the ability to send and receive wire and electronic communications.

183. As a direct and proximate result of Kelley's misconduct described in this Count, POM sustained actual damages and incurred costs associated with investigating and remedying Kelley's unauthorized intrusions into POM's email system.

184. Kelley's misconduct described in this Count arises out of and is connected to violations of Section 3 of the Employment Agreement. Among other things, the conduct giving rise to this Count constitutes a violation of Section 3 of the Employment Agreement.

## COUNT VI
## VIOLATION OF FEDERAL DEFEND TRADE SECRETS ACT

185. POM incorporates by reference herein Paragraphs 1-136 of this Complaint.

186. The Machine Location Datasets consist of information that is stored electronically within POM's computer systems and servers. In particular, the Machine Location Datasets identify the location of POM games.

187. POM has invested substantial company resources in compiling, updating, and maintaining the accuracy of the data contained in the Machine Location Datasets.

188. The Machine Location Datasets are confidential to POM, and POM treats them as such.

189. POM takes reasonable measures to preserve the secrecy of the Machine Location Datasets, including but not limited to limiting access to the Machine Location Datasets to persons who have executed binding confidentiality agreements; limiting access to the Machine Location Datasets to persons having a legitimate business need to access the data; and storing the Machine Location Datasets in secure

electronic systems that can only be accessed using company-issued security credentials.

190. The contents of the Machine Location Datasets derive independent economic value from not being generally known to persons outside POM. Among other things, another electronic gaming company could use the location data within the Machine Location Datasets to identify favorable locations for locating electronic games, thereby freeriding on POM's business know-how and POM's substantial investment in identifying favorable locations and developing relationships with the owners or operators of those locations. Absent access to the Machine Location Datasets, a competitor either could not compile a comparable set of favorable locations or else would have to invest considerable resources to do so.

191. The Machine Location Datasets are hosted on servers located in or about Duluth, Georgia. Any person accessing the Machine Location Datasets would do so by accessing those servers.

192. The Machine Location Datasets were developed in the course of interstate commerce and for use in interstate commerce. Among other things, the Datasets were created, stored, transmitted, and accessed using electronic means involving the wires and instrumentalities of interstate commerce. In addition, the Machine Location Datasets reflect and are used in commerce conducted and directed

across state lines, including the transaction of commerce between Georgia and Pennsylvania.

193. Kelley received access to the Machine Location Datasets in order to enable him to perform his job duties as a compliance officer.

194. Section 3 of the Employment Agreement imposed strict confidentiality obligations on Kelley with respect to the Machine Location Datasets.

195. Kelley disclosed the Machine Location Datasets (or portions thereof) to the Deibler and Conley enterprises, which competed against POM.

196. Kelley did not have POM's express or implied consent to do so.

197. At the time of the foregoing disclosures, Kelley knew and had reason to know that he owed a duty to POM to maintain the secrecy of the Machine Location Datasets.

198. Kelley used the Machine Location Datasets (or portions thereof) to assist the Deibler and Conley enterprises in their direct competition against POM.

199. Kelley did not have POM's express or implied consent to do so.

200. At the time of the foregoing uses, Kelley knew and had reason to know that he owed a duty to POM to maintain the secrecy of the Machine Location Datasets.

201. As a direct and proximate result of the foregoing misappropriations of the Machine Location Datasets, POM sustained economic harm, including but not limited to lost profits as a result of competition from illegal gambling machines.

202. POM sustained those economic losses at its headquarters and principal place of business in Duluth, Georgia.

203. Kelley's misappropriation of the Machine Location Datasets was willful and malicious.

204. Kelley's misappropriation of the Machine Location Datasets arises out of and is connected to violations of Section 3 of the Employment Agreement. Among other things, the conduct giving rise to this Count constitutes a violation of Section 3 of the Employment Agreement.

## COUNT VII
## VIOLATION OF GEORGIA COMPUTER SYSTEMS PROTECTION ACT

205. POM incorporates by reference herein Paragraphs 1-136 and 157-166 of this Complaint.

206. POM's email system constitutes a "computer network" within the meaning of O.C.G.A. § 16-9-92.

207. The emails stored within POM's email system, and the information contained in those emails, constitute "data"—and therefore "property"—within the meaning of O.C.G.A. § 16-9-92.

208. As described above, on or about September 7, 2023; October 4, 2023; and October 25, 2023, Kelley used a computer and POM's computer network to forward emails stored within POM's email system to email accounts outside of POM's control, including Kelley's personal email account and an email address whose ownership and control is unknown to POM.

209. On each of those occasions, Kelley caused POM's computer network to perform computer operations, including retrieving the emails from POM's email system and transmitting them outside of POM's email system.

210. On each of those occasions, Kelley knew that his use of POM's computer network was without authority. Among other things, Kelley's employment with POM had terminated effective December 31, 2022, and Kelley was aware that POM's' Employee Handbook provided that no employee is authorized to access the Company's computer/network system after termination of employment absent express written authorization from the President of the Company. Kelley never received such authorization.

211. Kelley used POM's computer network with the intention of taking and appropriating POM's property, namely, the forwarded emails and the data contained in them.

212. Kelley also used POM's computer network with the intention of converting POM's property to his own use, in violation of the Employment

Agreement and other known legal obligations that required Kelley to make a specified application or disposition of that property. Among other things, Section 3 of the Employment Agreement required Kelley to keep POM's Confidential Information in strictest confidence and not to use it for his own benefit, and POM's Employee Handbook required Kelley to return all Company property, including electronically stored information, upon the termination of his employment. On information and belief, Kelley used the contents of the forwarded emails for his own benefit and disclosed them to third parties.

213. Kelley also used POM's computer network with the intention of obtaining POM's property by deceitful means or artful practice. As described above, Kelley's access to POM's email system depended on login credentials that he was required to return to POM upon the termination of his employment and that he knew he was not authorized to use after the termination of his employment.

214. By entering those credentials on POM's login page, Kelley falsely presented himself to POM's computer network as an authorized user. That caused the network to grant him access to POM's email system and the data stored within it, which Kelley then obtained by forwarding emails to accounts outside POM's control.

215. Kelley thereby committed computer theft in violation of O.C.G.A. § 16-9-93(a)(1) through (a)(3).

216. As a direct and proximate result of Kelley's violations of O.C.G.A. § 16-9-93(a), POM's property was injured, and POM sustained damages, including but not limited to victim expenditure incurred to verify whether Kelley's unauthorized use altered, deleted, damaged, or destroyed POM's computer network or data, and diminution in value of POM's Confidential Information.

217. Pursuant to O.C.G.A. § 16-9-93(g), POM is entitled to recover all damages sustained as a result of Kelley's violations, including victim expenditure, together with its costs of suit.

218. Kelley's misconduct described in this Count arises out of and is connected to violations of Section 3 of the Employment Agreement. Among other things, the conduct giving rise to this Count constitutes a violation of Section 3 of the Employment Agreement.

## PRAYER FOR RELIEF

WHEREFORE, POM respectfully requests a judgment against Kelley providing the following:

a. A permanent injunction:

   i. Prohibiting Kelley from disclosing any confidential information of POM, in violation of Section 3 of the Employment Agreement;

   ii. Prohibiting Kelley from using any confidential information of POM for purposes other than advancing the interests of POM;

iii. Prohibiting Kelley from disclosing or using any trade secrets of POM, including but not limited to the Machine Location Datasets (or any data contained therein); and

iv. Requiring Kelley to identify all persons to whom he disclosed any confidential information of POM and any trade secrets of POM.

b. An award of POM's actual damages caused by Kelley's unlawful conduct, including but not limited to lost revenue as a result of competition from illegal gambling machines and the costs of investigating Kelley's unlawful conduct.

c. An award of restitution and disgorgement of all amounts paid by POM as a result of Kelley's POM employment, including but not limited to all salary paid to Kelley, all employee benefits provided to Kelley, and all payroll taxes resulting from Kelley's employment.

d. An award of disgorgement equal to all amounts that Kelley earned as a result of his conduct that violated the Employment Agreement.

e. An award equal to a reasonable royalty for the misappropriation of POM's trade secrets.

f. An award equal to Kelley's unjust enrichment caused by the misappropriation of POM's trade secrets.

g. An award of punitive damages.

h. An award of exemplary damages under 18 U.S.C. § 1836(b)(3)(C).

i. An award of all amounts recoverable under 18 U.S.C. § 2707(c).

j. An award of all damages and costs of suit recoverable under O.C.G.A. § 16-9-93(g).

k. An award of POM's reasonable attorney's fees and costs incurred in connection with this action.

l. Such further relief as the Court deems just and appropriate.

Respectfully submitted, this 20th day of October, 2026.

WOMBLE BOND DICKINSON (US) LLP

By: */s/ John G. Perry*
Joe D. Whitley
Georgia Bar No. 756150
John G. Perry
Georgia Bar No. 141609
1331 Spring Street, NW, Suite 1400
Atlanta, Georgia 30309
Telephone: (404) 872-7000
Joe.Whitley@wbd-us.com
John.Perry@wbd-us.com

Jason C. Hicks*
WOMBLE BOND DICKINSON (US) LLP
21 E. Main Street, Suite P
Charlottesville, Virginia 22902
Telephone: (256) 834-8651
Jason.Hicks@wbd-us.com

Michael Martinich-Sauter*
Peter Reed*
Ken Capps*
Daniel Carter*

JAMES OTIS LAW GROUP, LLC
530 Maryville Centre Drive, Suite 230
St. Louis, Missouri 63141
Telephone: (314) 949-3018
michael.martinich-sauter@james-otis.com

* Pro hac vice application forthcoming